IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WEIFANG TENGYI JEWELRY TRADING CO., LTD., | ) Case No. 18-cv-4651 |
| | ) |
| | ) **Judge Gary S. Feinerman** |
| Plaintiff, | ) |
| | ) **Magistrate Judge Jeffrey Gilbert** |
| v. | ) |
| | ) |
| THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A" | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**REPLY IN SUPPORT OF DEFENDANTS INTUII LLC AND
JENS SORENSEN'S REQUEST FOR DAMAGES**

Plaintiff failed to conduct an adequate pre-filing investigation and sought a TRO under false pretenses, resulting in severe harm to Defendant Intuii LLC and Jens Sorensen's (collectively, "Intuii") business. In granting Intuii's motion to lift TRO, the Court continued Intuii's request for damages and ordered Plaintiff to explain Plaintiff's pre-filing investigation regarding: 1) "the location of Defendants Intuii LLC and Jens Sorensen"; and 2) "whether they sold counterfeit ULOVEIDO products." 08/17/18 Order [Doc. 44]. Plaintiff's opposition [Doc. 53] confirms it conducted no good faith pre-filing investigation into either of these two questions.

Plaintiff did not investigate Intuii's location, even though following the link in Plaintiff's Schedule A and clicking on the seller's store name would have revealed that Intuii was "based in the United States." Plaintiff also did not investigate whether the products offered for sale by Intuii were counterfeit or genuine ULOVEIDO products. Plaintiff's General Manager, Teng Guangyao, asserts that he reviewed the "evidence" from Intuii's Diaperdisco eBay store, but that

evidence was a screen print of an online ad that did not even have a picture of the accused product. Guangyao Decl. [Doc. 52] ¶ 41. Mr. Guangyao asserts that he concluded Intuii's item was not genuine "as the price is **higher** than a comparable ULOVEIDO product" (emphasis added). *Id*. ¶ 42. That is not evidence of counterfeiting. Mr. Guangyao's declaration shows that Plaintiff was well aware of online resellers purchasing and drop shipping genuine ULOVEIDO products, but Plaintiff did no investigation to distinguish those defendants, like Intuii, from actual counterfeiters. Rather than conduct any investigation to ascertain which defendants were selling genuine products and which were selling counterfeits, Plaintiff falsely asserted that all defendants were counterfeiters.

Plaintiff simply ignores the Court's questions and, instead, attempts to reargue the TRO. Thus, Plaintiff's opposition is not a good faith attempt to respond to the Court's inquiry into Plaintiff's pre-filing investigation, and provides further support for Intuii's request for damages.

**A.      Plaintiff Sought And Obtained The TRO Under False Pretenses**

      **1.      Plaintiff Did Not Investigate Intuii's Location Before Filing Suit And Seeking A TRO Against Foreign Defendants**

Plaintiff repeatedly asserted that the TRO was necessary to address blatant counterfeiting by foreign entities who may evade justice by transferring assets to offshore accounts. *See, e.g.*, Complaint [Doc. 1] ¶ 17 (alleging Defendants "reside in the People's Republic of China or other foreign jurisdictions"); Guangyao Decl. [Doc. 9] ¶¶ 18-19 (alleging defendants would "move funds" to "off-shore bank accounts outside the jurisdiction of this Court"); Mem. in Supp. of TRO [Doc. 13] at 2 (arguing for TRO based on "the covert nature of offshore infringing activities and the vital need to establish an economic disincentive for infringement"). At the TRO hearing, this Court asked if this was "one of those trademark cases" involving entities from China, to which Plaintiff responded "that's correct." Banister Decl. [Doc. 51], Ex. F at 2:7-22.

Plaintiff then moved to extend the TRO to prevent defendants from moving funds to "off-shore bank accounts beyond the jurisdiction of the Court." Mem. in Supp. of Extend [Doc. 18] at 2.

Despite making these representations, Plaintiff did not investigate the true location of the defendants. There is no dispute that Jens Sorensen is a U.S. citizen and Intuii is a California LLC, and both are located in San Diego, California. Plaintiff could have discovered that Intuii was located in the U.S. by following a simple link contained in Schedule A of its Complaint and then clicking on "Diaperdisco." This one additional mouse click would have taken Plaintiff to Intuii's Diaperdisco store home page showing that it is based in the United States. Indeed, counsel's recent declaration attaches a screenshot of Diaperdisco's store, which clearly shows:



Banister Decl. [Doc. 51], Ex. B.[1] Had Plaintiff done so for each accused defendant, it would have discovered that 70% of the defendants admit to being located in China and nearly 10% are located in the United States. *Id.* ¶ 11. Rather than do this minimal investigation, Plaintiff filed its motion for TRO and falsely alleged that all defendants were foreign entities who were likely to conceal assets, causing immediate and severe harm to those falsely accused.

Plaintiff speculates that some defendants might be using false designations on their eBay accounts. *Id.* ¶ 12. Merely because some unscrupulous actors might not be forthcoming does not excuse Plaintiff from meeting its Rule 11 obligations and conducting even a modicum of investigation to confirm the veracity of its allegations. This is especially true in view of the

---

[1] While Exhibit B shows where diaperdisco is located, Plaintiff's brief and declaration fail to mention that. Instead, Plaintiff dodges the Court's question regarding its pre-suit investigation as to location and argues the diaperdisco store does not disclose "contact information." Opp'n [Doc. 53] ¶ 5; Banister Decl. [Doc. 51] ¶ 7.

severity of the allegations that formed the basis of Plaintiff's TRO motion and the extreme relief sought and obtained under false pretenses.

### 2. Plaintiff Did Not Investigate Whether Intuii Was Selling Counterfeit ULOVEIDO Products Before Filing Suit And Seeking a TRO

In its motion for TRO, Plaintiff argued defendants were "selling Counterfeit ULOVEIDO Products that look similar to genuine ULOVEIDO Products" and were "intentionally trying to induce consumers looking for genuine ULOVEIDO Products to purchase Counterfeit ULOVEIDO Products instead." Mem. in Supp. of TRO [Doc. 13] at 8; *see also id.* at 13-14 (arguing TRO was necessary to prevent consumers from believing "Defendants' Counterfeit ULOVEIDO Products have been manufactured by or emanate from Plaintiff, when in fact, they have not"). Plaintiff even declared, under penalty of perjury, that defendants were selling "cheap imitation counterfeits of ULOVEIDO Products," that were "not authorized, produced or manufactured by Plaintiff," and could be confused with "genuine" products. Guangyao Decl. [Doc. 9] ¶¶ 10, 20-24. But Plaintiff did nothing to ascertain whether Intuii (or any other defendant) was actually selling counterfeit goods.

Plaintiff did not purchase or examine the actual product that was advertised on Intuii's Diaperdisco eBay store. On the contrary, Plaintiff knew that some defendants were selling Plaintiff's genuine products, admitting, in a declaration opposing Intuii's damages request, that certain online sellers "insert themselves as uninvited middlemen by using, without our authorization or consent, our marketing materials and other intellectual property to sell our products on eBay and other online platforms." Guangyao Decl. [Doc. 52] ¶ 31. Plaintiff did not reveal this fact to the Court when seeking a TRO. Instead, Plaintiff falsely asserted that all defendants were counterfeiters.

Mr. Guangyao asserts that he "reviewed the evidence for the Defendant eBay Store Diaperdisco, listed as Defendant 169 on Amended Schedule A." *Id.* ¶ 41. But this evidence consists of a printout of an advertisement that does not even show an image of the product. Plaintiff allegedly concluded that Intuii's product offering was counterfeit because Intuii did not ask permission to sell Plaintiff's products. *Id*. This is not an investigation regarding whether Intuii was selling genuine or counterfeit goods. Plaintiff also allegedly concluded that Intuii was selling counterfeit products because Intuii's price was **higher** than a comparable ULOVEIDO product. *Id.* ¶ 42. This is also insufficient. If anything, a higher price might indicate that Intuii was reselling genuine products, rather than a "cheap imitation counterfeit." Moreover, with the exception of Exhibit G, all of the evidence presented by Mr. Guangyao was generated on August 21 and 22, 2018—long after the TRO. *Id*., Ex. A-F and ¶¶ 41-42.

**B.    Plaintiff's Legal Arguments On The Merits Are Incorrect And Plaintiff Is Unable To Demonstrate A Likelihood Of Success On The Merits**

Rather than acknowledge its failure to conduct a pre-suit investigation, Plaintiff reargues the merits of its infringement claims. In so doing, Plaintiff doubles down on its frivolous argument that the unauthorized sale of genuine products renders those products counterfeit.

**1.    Genuine Goods Are Not Counterfeit**

By every definition of "counterfeiting," including the express language of the Lanham Act, its legislative history, and cases addressing counterfeiting, genuine goods are not and cannot be counterfeits. This is a basic and fundamental truth, and Plaintiff's arguments to the contrary are frivolous, lack good faith, and result in vexatious litigation.

The Lanham Act expressly states that the term "counterfeit" does not apply to genuine goods. "[T]he term 'counterfeit mark' … does not include any mark or designation used on or in connection with goods or services of which the manufacture or producer was, at the time of the

manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation." 15 U.S.C. § 1116(d)(1)(B). That is the definition of genuine products, *i.e.* products that are made by authorized manufacturers or producers.

The criminal portion of the Lanham Act similarly defines "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The legislative history explains that "spurious" means "not genuine or authentic" and the criminal and civil definitions are "identical in substance." Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, H12078 (daily ed. Oct. 10, 1984).

"Counterfeiting is the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine mark." *Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc.*, 1998 WL 767440, *7 (E.D. Penn. 1998) (quoting J. THOMAS McCARTHY, McCARTHY ON TRADEMARKS § 25:10 (3d ed. 1997)); *Channel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 n.2 (D.N.J. 2008) (same); *Louis Vuitton Malletier v. Veit*, 211 F. Supp. 2d 567, 581 (E.D. Penn. 2002) (same); *see also State of Idaho Potato Comm'n. v. G&T Terminal Packaging*, 425 F.3d 708, 721 (9th Cir. 2005) (a "counterfeit mark" is a "non-genuine mark identical to [plaintiff's] mark."). Counterfeiting is "hard core" or "first degree" infringement that is an aggravated form of "trademark infringement that seeks to trick the consumer into believing he or she is getting the genuine article." *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012).

Thus, Plaintiff's own ULOVEIDO products, made by or for Plaintiff, cannot be counterfeits. Use of the ULOVEIDO trademark in connection with sales or offers to sell Plaintiff's own genuine ULOVEIDO products is not counterfeiting under the Lanham Act.

Plaintiff is well aware of what true counterfeiting is. In 2017, Versace obtained a preliminary injunction against Plaintiff's "Uloveido Official Store" for allegedly selling counterfeit Versace goods. Zelkind Decl., Ex. A at 2. Plaintiff's counsel in this case also represented Plaintiff's Uloveido store and three other alleged counterfeiters in the *Versace* case. Zelkind Decl., Ex. B. Those defendants argued they sold mostly "legal items" and only a limited number of truly counterfeit goods.[2] *Id.* at 5. Thus, it is disingenuous for Plaintiff to now assert that genuine products can be considered counterfeits.

Moreover, Plaintiff and its counsel in this case filed declarations that appear to have plagiarized the *Versace* plaintiff's declarations. Bannister's four-paragraph declaration is nearly identical to the first four paragraphs from counsel's declaration in *Versace*. Similarly, Mr. Guangyao's declaration contains numerous paragraphs that are nearly the same as the *Versace* plaintiff's declaration. Below is an example paragraph in each declaration.

| *Versace* Decl. (Zelkind Decl., Ex. C) ¶ 2 | Banister Decl. [Doc. 8] ¶ 2 |
|---|---|
| According to a January 2011 MarkMonitor report entitled "Traffic Report: Online Piracy and Counterfeiting," the combined traffic to 48 sites selling counterfeit goods was more than 240,000 visits per day on average or more than 87 million visits per year. A 2012 MarkMonitor article entitled "White Paper: Seven Best Practices for Fighting Counterfeit Sales Online" reported that counterfeiters' illicit online activities will cost legitimate businesses $135 billion in lost revenue annually. True and correct copies of these reports are attached hereto as **Exhibit 1**. | According to a January 2011 Mark Monitor report entitled "Traffic Report: Online Piracy and Counterfeiting," the combined traffic to 48 sites selling counterfeit goods was more than 240,000 visits per day on average or more than 87 million visits per year. A 2012 Mark Monitor article entitled "White Paper: Seven Best Practices for Fighting Counterfeit Sales Online" reported that counterfeiters' illicit online activities will cost legitimate businesses $135 billion in lost revenue annually. True and correct copies of these reports are attached hereto as Exhibit 1. |

---

[2] Notably, while the other three alleged counterfeiters provided evidence of their limited sales, the Uloveido store promised to provide similar evidence, but never did. Zelkind Decl., Ex. B at 5.

| *Versace* Decl. (Zelkind Decl., Ex. D) ¶ 15 | Guangyao Decl. [Doc. 9] ¶ 12 |
|---|---|
| I, or someone working under my direction, analyzed each of the Defendant Internet Stores and determined that Counterfeit Versace Products were being offered for sale to residents of the United States, including Illinois residents. This conclusion was reached through visual inspection of the products listed for sale on each Defendant Internet Store, the price at which the Counterfeit Versace Products were offered for sale, other features commonly associated with websites selling counterfeit products, and because Defendants and their Defendant Internet Stores do not conduct business with Versace and do not have the right or authority to use the Versace Trademarks for any reason. | I personally analyzed each of the Infringing Webstores, screenshots of which are attached hereto, and determined that Counterfeit Products are being offered for sale to residents of the United States and the State of Illinois. I reached this conclusion through visual inspection of the products as they appeared on the Infringing Webstores, the price at which the Counterfeit Products were offered for sale, other features commonly associated with websites selling counterfeit products, because Defendants offered shipping to Illinois, and because Defendants and the Infringing Websites do not conduct business with the Plaintiff and do not have the right or authority to use the ULOVEIDO mark for any reason. |

*Compare* Zelkind Decl., Ex. C, ¶¶ 2-4 *with* Banister Decl. [Doc. 8] ¶¶ 2-4; *compare* Zelkind Decl., Ex. D, ¶¶ 9, 15-28 *with* Guangyao Decl. [Doc. 9] ¶¶ 9, 12, 14-25; *see also* Zelkind Decl. Ex. F (comparison chart containing all substantially identical paragraphs). Plaintiff even used the defined term "Defendant Internet Stores" from *Versace*, but forgot to actually include the definition in its own declaration. *See* Guangyao Decl. [Doc. 9] ¶ 13.

This evidence further underscores that Plaintiff did not conduct its own pre-suit investigation and, instead, merely lifted the words that Versace previously used to obtain an injunction against Plaintiff. This apparent plagiarism from a true counterfeiting case also explains why Plaintiff continuously refers to Intuii and Sorensen as "counterfeiters" even though they only offered for sale Plaintiff's genuine ULOVEIDO products.

      2.      **Unauthorized Sales Of Genuine Goods Is Not Trademark Infringement**

Plaintiff attempts to salvage its case by advancing a new theory that the unauthorized sale of genuine goods is somehow trademark infringement. *See* Pl's Opp'n [Doc. 53] at 6. But that

new theory was not the basis for the Plaintiff's TRO and the Court did not rely on any such theory in granting the TRO. *See* Zelkind Decl., Ex. E at 6:1-5 (this Court finding "there was nothing, zero, in the complaint or in the motion for a TRO articulating a theory that even if the goods are genuine, it violates the trademark or some other law to offer those goods for sale without first acquiring them"). Plaintiff cannot avoid paying for the damages its TRO caused by shifting to a new infringement theory.

Moreover, Plaintiff's new theory is also wrong as a matter of law. The use of a trademark in a sale or offer for sale of a genuine product is not trademark infringement because there is no likelihood of confusion as to the source of the goods. At its core, trademark infringement exists when use of a mark is "likely to cause confusion among consumers." *Barbecue Max, Incorp. v. 551 Ogden, Incorp.*, 235 F.3d 1041, 1043 (7th Cir. 2000). Plaintiff argues that consumers could be confused about Intuii being an authorized distributor. But merely reselling genuine products online does not create confusion as to sponsorship. *See Ty v. Perryman*, 306 F.3d 509, 512-13 (7th Cir. 2002) (holding no likelihood of confusion where unauthorized reseller purchased "Beanie Babies" and resold them at a markup). Indeed, the "mere unauthorized sale of a trademarked item does not result in a Lanham Act violation." *Leonel & Noel Corp. v. Cerveceria Centro Americana, S.A.*, 758 F. Supp. 2d 596, 603 (N.D. Ill. 2010); *Hart v. Amazon.com, Inc.*, 191 F. Supp. 3d 809, 818 (N.D. Ill. 2016); *Microsoft Corp. v. V3 Sols. Inc.*, 2003 WL 22038593, at *8 (N.D. Ill. Aug. 28, 2003).

*Hart* addressed facts very similar to this case. In *Hart*, plaintiff pursued a trademark claim based on "individuals re-selling copies of [plaintiff's] books through Amazon's website without plaintiff's permission." *Hart*, 191 F. Supp. 3d at 819. The plaintiff argued that the Amazon listings created the false impression that the listings were authorized. *Id.* The court

rejected that theory because that is "not the reality of commerce." *Id.* "As a comparison, a shopper at a bookstore does not automatically believe that just because a used book is appearing at the store, the author is expressly endorsing that store. The same is true for a book that is resold on Amazon." *Id.* Similarly, here, merely offering for sale genuine products in an eBay store in no way suggests that the seller of those products is authorized or affiliated with Plaintiff. Indeed, no consumer would believe that "diaperdisco" is an authorized jewelry reseller.

Rather than address the test for infringement, Plaintiff argues that the "first sale" defense does not apply. Mem. in Supp. of PI [Doc. 55] at 6-8. That is a red herring. This Court need not address the first sale doctrine because, as addressed above, there can be no likelihood of confusion from offering for sale genuine goods. Regardless, each of Plaintiff's arguments are unsupported and contrary to law. Intuii addresses each below in turn.

        a.    **No Authority Holds That The First Sale Doctrine Requires A Seller To Have The Product In Its Possession Before Advertising It**

Plaintiff argues that "[a]ffirmative authority does in fact exist for the proposition that a first sale must take place before the affirmative defense of first sale and exhaustion may be applied." Mem. in Supp. of PI [Doc. 55] at 6-7. This argument ignores the ultimate question of likelihood of confusion. Moreover, none of the authorities Plaintiff cites support that position.

Far from supporting Plaintiff's assertion, *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 509 F. Supp. 2d 1247 (S.D. Fla. 2007) actually supports Intuii's position. In that case, the first sale doctrine did not apply because defendant engaged in "something more" than merely offering for sale and selling genuine goods. *Id.* at 1260-61. The defendant used significant promotional materials from plaintiff and engaged in deception, including using a "secret" supplier and wearing a disguise when meeting plaintiff. *Id.* at 1260-61. Those facts are not present here.

More importantly, *Hidalgo* found *no* trademark infringement. *Id.* at 1362-63. *Hidalgo* held there was no likelihood that *consumers* would be confused into believing that a traveling jewelry merchant was an authorized dealer for Hidalgo. *Id*. As the court explained, "[t]he 'keystone' of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods . . . among the relevant class of customers and potential customers." *Id.* at 1361. Similarly, here, as in *Hart*, there is no reason a consumer would believe that an eBay store called "diaperdisco" was an authorized jewelry reseller.[3]

### b. The "Sponsorship Exception" Does Not Apply

Next, Plaintiff argues that the first sale doctrine does not apply because of the "sponsorship exception." Mem. in Supp. of PI [Doc. 55] at 7-8. But courts in this district have already rejected that theory on facts similar to this case. In *Hart*, the plaintiff argued that the unauthorized selling of books on Amazon led to the false impression that plaintiff authorized the listings or was associated with the sellers. 191 F. Supp. 3d at 819. As discussed above, the court rejected that theory because no consumer would believe the author endorsed the seller. *Id.*

Further, none of Plaintiff's authorities support its attempt to expand deceptive sponsorship to include merely offering for sale a genuine product on eBay. In *D 56, Inc. v. Berry's, Inc.*, 955 F. Supp. 908, 910-20 (N.D. Ill. 1997), the defendant used a "significant amount of paraphernalia bearing plaintiff's trademark," including pamphlets and large posters throughout the store, and there was strong evidence of actual confusion. In *Burger King Corp. v.*

---

[3] Plaintiff's other cases are irrelevant because they merely discussed whether the first sale doctrine applies when the trademark owner never authorized the sale of any goods in the first instance. *See FITBIT, Inc. v. Laguna 2, LLC*, Case No. 17-cv-00079-EMC (N.D. Cal. Feb. 24, 2017) (addressing "scrap" products that should have been destroyed); *Italverde Trading v. Four Bills of Lading*, 485 F. Supp. 2d 187 (E.D.N.Y. 2007); *Grateful Palate Inc. v. Joshua Tree Imps., LLC*, 220 Fed. Appx. 635, 637 (9th Cir. 2007). None of these cases address the facts presented here—merely offering for sale genuine products purchased directly from the trademark owner.

*Mason*, 710 F.3d 1036, 1063 (9th Cir. 1999), the defendant continued operating a franchise, with its signage and branding, after the franchisor terminated the franchise agreement. None of these aggravating factors exist here. Intuii does not hold itself or any of its eBay stores out as an authorized dealer of ULOVEIDO jewelry.

Plaintiff's remaining cases address situations where the defendant intentionally used the plaintiff's marks to sell *different* products that compete with plaintiff's products. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000) (use of PROZAC mark in metatags to sell HERBROZAC product); *New York State Soc. of Certified Public Accountants v. Eric Louis Assoc., Inc.*, 79 F. Supp. 2d 331, 341 (S.D.N.Y. 1999) (use of plaintiff's mark in domain name and metatags to sell unrelated services); *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006) (engaging in substantial deception and using plaintiff's marks and products to drive traffic to its website so that it could sell competitive lotions). These cases are also inapposite.

        **c.**        **There Are No "Material Differences" Between The Accused Goods And Plaintiff's Genuine Goods**

Finally, Plaintiff argues the first sale doctrine does not apply to goods that are "materially different." Mem. in Supp. of PI [Doc. 55] at 8-9. Plaintiff cites cases dealing with Lanham Act violations stemming from sales of products that are materially different from genuine products. But there are no differences in the ULOVEIDO products consumers would have received from Plaintiff or Intuii. There is no dispute that Intuii's advertisement linked to Plaintiff's own Amazon store. If a consumer purchased one of Plaintiff's products from Intuii, Intuii would have paid Plaintiff for the product and Plaintiff would have shipped the product to the consumer. The consumer would have received exactly the same product, in exactly the same packing material, directly from Plaintiff.

Plaintiff argues that it offers "warranty protection" and a "generous return policy." *Id.* at 9. Plaintiff speculates that "[u]nauthorized sellers may or may not offer the same warranty," but offers no evidence to support that speculation. *Id.* More importantly, Plaintiff argues that its warranty is void only if the item is "returned to the unauthorized seller and the unauthorized seller then seeks the benefit of our warranty." *Id.* Thus, Plaintiff essentially admits that consumers will receive the *full warranty* if they deal directly with the Plaintiff. There is nothing abnormal about customers obtaining warranty service from the manufacturer instead of the retailer. For example, if a consumer purchases a TV from BestBuy, they understand that the standard warranty is serviced by the manufacturer—not BestBuy, and that BestBuy's warranty might differ from the manufacturer's warranty.

**C.    Conclusion**

Plaintiff obtained its TRO by representing to this Court that defendants sold counterfeit goods and were foreign nationals who were likely to hide their assets. The Court recognized these assertions were both incorrect, at least as to Intuii and Sorensen. Thus, the Court ordered Plaintiff to explain its pre-filing investigation regarding Intuii's and Sorensen's locations and whether they sold counterfeit products. Plaintiff completely ignored these questions and offers no evidence that it conducted any investigation at all regarding these questions. That, combined with Plaintiff's copying of sworn statements in *Versace*, demonstrates that Plaintiff acted in bad faith, justifying an award of Intuii's and Sorensen's damages.

> Respectfully submitted,
>
> **COHON RAIZES & REGAL LLP**

Dated: August 30, 2018           By: */s/ Boris Zelkind*
                                              One of its Attorneys

Michael K. Friedland (to be admitted *pro hac vice*)
Boris Zelkind (admitted *pro hac vice*)
Adam B. Powell (to be admitted *pro hac vice*)
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502
michael.friedland@knobbe.com
boris.zelkind@knobbe.com
adam.powell@knobbe.com


Carrie A. Dolan
J. Michael Williams
**COHON RAIZES & REGAL LLP**
208 South La Salle Street, Suite 1440
Chicago, Illinois 60604
Phone:  (312) 726-2252
Fax:  (312) 726-0609
cdolan@cohonraizes.com
mwilliams@cohonraizes.com

## CERTIFICATE OF SERVICE

The undersigned counsel for Defendants Intuii LLC and Jens Sorensen hereby certify that on **August 30, 2018**, a true and correct copy of **REPLY IN SUPPORT OF DEFENDANT INTUII LLC AND JENS SORENSEN'S REQUEST FOR DAMAGES** was filed electronically with the Clerk of Court through the Court's CM/ECF System, which will provide electronic notification of such filing to the following Counsel of Record:

L. Ford Banister, II
The Law Office of L. Ford Banister, II
244 5th Avenue, Suite 1888
New York, NY  10001
ford@fordbanister.com
Mailing Address:
P.O. Box 3514 PMB 23332
New York, NY  10008
Telephone:  (212) 574-8107

Charles E. McElvenny
Law Office of Charles E. McElvenny
20 North Clark Street, Suite 2200
Chicago, IL  60602
charlie@cemlawfirm.com
Telephone:  (312) 291-8330

*Attorneys for Plaintiff,*
WEIFANG TENGYI JEWELRY TRADING CO., LTD.

Richard P. Beem
Beem Patent Law Firm
53 W. Jackson Blvd., Suite 1352
Chicago, IL  60604
richard@beemlaw.com
Telephone:  (312) 201-0011

*Attorneys for Defendant,*
ATRIYA BHATTACHARYA (DEFENDANT NO. 362)

Dated:  August 30, 2018          By:  */s/ J. Michael Williams*
                                         One of their Attorneys